## Case No. 1,895.

### The BRITISH AMERICA.

[10 Ben. 417.] [1]

District Court, E. D. New York. April Term, 1879.

COLLISION—BETWEEN SAILING VESSELS—CROSSING COURSES—LOOKOUT.

1. Where two vessels came in collision near the lightship at the mouth of New York harbor, the ship B. A. sailing about north on the port tack, close-hauled with the wind WNW, and the brig C. W., sailing about SW, having just changed to the starboard tack and again putting her helm down, in extremis: *Held*, that the only question was whether the brig changed from the port to the starboard tack when so near the ship that the ship could not thereafter avoid her.

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

2. That upon the evidence it must be concluded that the red light of the brig which should have been brought in view by that change was visible to the ship at least five minutes before the collision and at a distance of at least 3,000 feet.

3. That such a distance and length of time was ample for the ship to have avoided the brig.

4. That the brig was not in fault for tacking as she did at that distance, and the ship was in fault for not seeing her red light until it was within 360 feet and too late to avoid the collision

[In admiralty. Libel by George W. Churchill and others, owners of the American brig Carrie Winslow, against the British ship British America. Decree for libellants.

[For proceedings by the owners of the British America for limitation of liability, see Churchill v. The British America, Case No. 2,715.]

Scudder & Carter, for libellants.

W. W. Goodrich, for claimants.

BENEDICT, District Judge. This action is brought by the owners of the brig Carrie Winslow to recover the sum of $200,000, being the damages caused by a collision that occurred between that brig and the ship British America at the entrance to New York harbor, on the morning of the 11th day of February, 1878.

Many of the important facts are not in dispute. The time of the collision was about 5 a. m. It was still dark, but the weather was not unfavorable for seeing lights, and ordinary ships' lights could be seen at the distance of at least a mile. The wind was blowing a stiff breeze from the WNW. The British America, a ship of 1,080 tons burthen, and 180 feet long, was sailing at a speed of 6 to 7 knots an hour, on a course about north, upon the port tack, close-hauled upon the wind. She had a full crew on board, besides a Sandy Hook pilot; a man was stationed on the lookout, and the ship's lights were burning brightly. As she approached the neighborhood of the lightship, a red light was suddenly observed by her lookout within two ships' lengths ahead of the ship; the helm was immediately put hard up, but the ship had time to fall off no more than about one point before she came violently in contact with a vessel, which proved to be the brig Carrie Winslow, striking her just abaft the fore chains on the port side, and so injuring her that she shortly sank.

In the libel filed by the owners of the brig to recover for the loss of their vessel, they aver that the brig, at the time of the collision, was close-hauled upon a course crossing the course of the ship, and having the wind on her starboard side, and her lights brightly burning, and they claim that it was the duty of the ship, under the circumstances, to avoid the brig, and they charge that the failure to do so arose from not keeping a proper lookout.

The answer on behalf of the ship, while denying the charge of fault made in the libel, when carefully perused is found to aver in substance that the cause of the collision was the stopping of the brig ahead of and so near to the ship that it was impossible to avoid a collision. Whether it is intended on the part of the ship to claim that the stopping of the brig in the course of the ship arose from a sudden luff on the part of the brig when on the port tack, or by reason of a sudden luff while on the starboard tack, is left uncertain by the answer.

It will clear the case from some possible obscurity to remark at the outset that the evidence does not permit the ship to contend that the brig can be held responsible for the collision because of a luff while on the starboard tack. The brig, shortly before the collision, changed from the port to the starboard tack, and afterwards, when on the starboard tack, did put her helm down; but this last movement was in extremis. It was caused by the proximity of the ship, and cannot be considered as a fault on the part of the brig. If any fault was committed by the brig, it was when she changed from the port to the starboard tack. The controversy is therefore reduced to the question whether the brig changed from the port to the starboard tack when so near the ship as to render it impossible for the ship to avoid her.

It is not to be doubted that when the brig changed from the port to the starboard tack, she could have gone further on the port tack, and that if she had continued on the port tack for a short distance further than she did there would have been no collision; and it would be easy to say that the brig caused the collision because she tacked as she did, when she could just as well have gone on without tacking. But such a conclusion would leave undetermined the question of fact upon which alone the liability of the brig depends. The vessels were in the open sea and it was no fault in the brig to take a course crossing the course of the ship, whether for a pilot or for any other reason, provided when she so tacked she was at a sufficient distance from the ship to enable the ship to avoid her. Before fault can be imputed to the brig because of her tack, the fact must be found that she was at the time of tacking so near the ship as to render it impossible for the ship to avoid her.

This question of fact upon which the case turns is somewhat narrow, but questions as narrow are constantly presented to navigators in actual practice, and not unfrequently are forced upon the courts for their determination. Questions of this character, when they arise in localities like that of this collision, are necessarily narrow. Locomotion in thoroughfares, upon the water as well as upon the land, is unsafe, if not impossible, unless everyone can move promptly according to rule upon the presumption that all others will be equally prompt and observant of rule. It was therefore the undoubted right of the ship as she approached the harbor of New York to hold her tack boldly to the bar, assuming that no vessel would take the opposite tack ahead of her except at such a distance as would enable the ship to avoid collision,—and the brig had the equally clear right to change her tack boldly before reaching the bar, assuming that any vessel whose course she might thereafter cross would be vigilant to see her red light so soon as it should be visible, and take prompt action to avoid her, if action was required.

It has been contended that the brig was never upon the starboard tack in the sense of the law, inasmuch as the evidence shows that at the time of the collision the brig's main peak had not yet been dipped, and dipping the peak is one of the ordinary operations to be performed in making a tack. But the evidence also shows that before the collision the brig had gathered head-way upon the starboard tack with her sails full, and that the delay in dipping the peak arose from the entanglement of some rope which had no effect to check the movements of the vessel.

The brig was to leeward of the ship and ahead. She came up to the wind in ordinary time, and from that time, at least, she was displaying her red light to the ship. From that time the lights were red to green and the brig was on a course crossing the course of the ship. The situation, therefore, was that of two vessels, both close-hauled, upon crossing courses, with the wind upon opposite sides. The ship had the wind on her port side, and the obligation was upon her to avoid the brig if it was possible for her to do so. The action which the ship took was promptly taken when the light was seen, and what she did was the right thing to do: she is therefore blameless unless the brig's light was visible before the time when it was seen and reported by the lookout, and when she had time to alter her course sufficiently to avoid collision.

The obligation binding upon the ship would be the same if, as stated in the ship's answer, the brig had stopped on her course when ahead of the ship, provided such stoppage occurred at a sufficient distance ahead of the ship to enable the ship to avoid her. But the brig did not stop in the way of the ship. When her light was seen she was under full headway on a course crossing that of the ship. She was approaching the course of the ship, and from the time of her coming into the wind her light was visible to those on board the ship. The question to be determined, therefore, is whether when she came into the wind, the distance between the two vessels was sufficient to enable the ship to avoid her.

The ship, in her answer, sets forth that the distance did not exceed two ship's lengths and was wholly insufficient to enable her to avoid collision; and on the part of the brig

it is insisted that the distance was much greater than is claimed by the ship, and sufficient to enable the ship to avoid the brig with ease. This question is, from the nature of the case, one that cannot be determined by reference to direct evidence. Its solution can only be accomplished by a close examination of the evidence, in order to ascertain what facts have been established, and a careful judgment in regard to the bearing of these facts upon the point in controversy. Such an examination I have endeavored to make, and the result has been to satisfy me that it is possible to say with confidence and upon evidence, that the distance from the ship at which the brig was when her red light could have been seen by those on the ship, and would have been seen by a vigilant lookout, was sufficient and more than sufficient to have enabled the ship to, pass under the stern of the brig in safety.

The argument on the part of the ship is that the distance between the two vessels at the time the brig's red light became visible did not exceed two ship's lengths, because the ship's lookout did not see the brig's light until it was within that distance. It is said the fact of a lookout being stationed forward on the ship raises the presumption that he saw the light as soon as it became visible. But such a presumption, even when reinforced by the testimony of the lookout that he was vigilant, does not establish the fact that the brig's light was not visible before it was seen by him, when as here it is impossible to reconcile the statement of the lookout with the evidence as to what transpired on board the brig after she came head to wind and before the collision. The evidence as to the acts done on board the brig during this period defeats all presumption in favor of the ship's lookout, and shows that instead of being vigilant, as he says, he was negligent, and thereby caused the disaster that followed.

Before proceeding to notice what transpired on board the brig, as indicating the lapse of time between the display of her red light and the collision, it is important to call attention to the following facts stated in the ship's answer, or proven by her, viz.: The ship was sailing at a speed of six or seven knots an hour. The brig's red light when first observed was within two ship's lengths ahead of the ship, i. e., 360 feet. The ship's helm was immediately put hard up, and she had fallen off about one point when she struck the brig.

The time that elapsed between seeing the brig's red light and the collision was about 20 seconds. The mate says: "It was a very short time. I had just time enough to shout to the man at the wheel to put the wheel hard up, and the pilot jumped aft, and they were on to us." And the master of the ship proves the further fact, that "the ship in that breeze, and under the sail she had, would swing six points to the wind in

about 30 seconds." These facts warrant the inference that the ship, at the time in question, with helm hard up, would describe a curve whose radius would not exceed 1,000 feet. This inference is not at variance with the common experience of mariners as given in the "American Rule of the Road," where it is said (page 159): "A curve whose radius is 250 yards is full allowance for all but the longest and largest class of ships." A distance of 1,000 feet was sufficient, therefore, to enable the ship to clear the brig, and, according to her own statement of her , speed, three minutes of time would put her at more than 1,000 feet.

Having in view the time in which it was possible for the ship to change her course so as to avoid an object ahead of her, attention may now be directed to the acts proved to have been done on board the brig during the period after she came head to wind and before the collision. In regard to what transpired on board the brig after she came into the wind upon the port tack, there is little room for dispute. The brig was sailing with her foresail clewed up, in a strong breeze. Upon the port tack her course was the same as that of the ship, but she did not sail as close to the wind as the ship by about one point. She was ahead and to leeward of the ship. The master having concluded to tack for a pilot, took the wheel and hove the vessel into the wind. All the operations pertaining to tacking were then performed, and everything coiled away, save only the dipping of the main peak, of which mention has already been made. The master then surrendered the wheel to a seaman, and went over the cabin to the poop deck, and after that, and when the vessel was under full headway, with the spray flying over her starboard bow, the lookout reported the ship's light. Soon he reported it again. The mate went forward to the topgallant forecastle and returned to the poop deck; then by order of the master he went to the forecastle and got a torch, which he lit and swung over the port side. The wheel was then hove hard down, and the vessel swung into the wind or nearly so, when she was struck by the ship. The acts appertaining to tacking the brig, done during this period, were not performed in haste under apprehension of danger, for no alarm was felt by any one on board the brig until the lookout reported the light the second time. On the contrary, the evidence indicates that rather more than the time ordinarily required to tack the vessel was occupied on this occasion; for it appears that in hauling the yards one was hauled too much and the other too little, so that the chief mate was obliged to have them trimmed to suit him, and the midship staysail having got snarled he was obliged afterwards to trim that, and then the halliards at the main peak having fouled, most of the crew were called aft to dip the peak. The evidence in

respect to the presence of the crew at the main peak halliards is conclusive to show that the brig was then under headway upon the starboard tack.

But while there is little room for dispute as to what acts were done on board the brig, in regard to the time occupied there is a great difference of opinion. In behalf of the brig it is contended that the time was not less than ten minutes, during which period the ship would sail more than a mile, at the rate of speed she is admitted to have been going. In behalf of the ship it is earnestly insisted that the time was less than three minutes. Of course no witness is produced who noted by a watch the time thus occupied. What the time was must be a matter of sound judgment and inference from other facts that are proved. Several classes of facts are proved which bear upon this question. Witnesses have been produced in behalf of the ship who by actual observation, watch in hand, have noted the time occupied by other vessels more or less similar to this brig, in tacking under circumstances more or less similar to those under which she tacked upon the occasion in question. Of these, Conway, a mariner of experience, who watched vessels tacking on two occasions at Fort Hamilton, found the time from "helm-a-lee" to the time of filling away, required by the vessels he observed, to be three minutes and a half. This witness was asked by the claimants to give his judgment as to the time the Carrie Winslow would require to gather headway after the order "hard-a-lee" under the circumstances proved in this case, and he gave the time as about four and a half minutes, a period of time sufficient to enable the ship to go 2,700 feet and over, sailing as stated in the answer.

To throw light upon this question the libellants have called a witness in no way connected with this collision, who has sailed this brig and knows from actual practice the time ordinarily required to tack her. The judgment of this witness is that under the circumstances proved, eight to ten minutes would necessarily elapse from the giving of the order hard-a-lee on board the brig until she filled away on the starboard tack. This is the witness's estimate of the time required, never having noted the time by a watch. The master of the ship, who knows the circumstances of wind and sea as they were at the collision, estimates that the brig, if an ordinary working vessel, would require from five to six minutes from the time she commenced to tack until she fills away and gathers headway. The mate of the ship thinks that the brig would gather headway in five minutes.

There is also the testimony of some eleven ship-masters and pilots who have been called to give their judgment as to the time that would necessarily elapse on such a vessel as the brig, under the circumstances proved, from "hard-a-lee" until she filled away.

Five of these witnesses are called by the claimants, and their statements of the time requisite vary from two and a half to five minutes. One of them gives rather more. Six witnesses are called by the libellants, whose statements of the time requisite vary from eight to fifteen minutes.

And finally there are the estimates of the officers and crew of the brig, who were actually engaged in performing the acts done on board the brig. Their estimates of the time occupied vary from ten seconds to fifteen minutes. Two of these witnesses, upon the inquiry of the claimants, say that the brig required from ten to twenty minutes to tack under the circumstances; but this estimate is not in harmony with the rest of their evidence, which, taken by itself, tends to show that the collision followed immediately upon the reporting of the ship's light by the lookout of the brig; although it should be noticed that one of these witnesses, Costar, agrees with the rest of the crew in saying that the brig had filled away on the starboard tack, and the other, Anthony, proves that the master had surrendered the helm after the tack was completed, and before the collision. The man to whom the wheel was surrendered estimates that he had the wheel five minutes before the ship's light was reported. This estimate is doubtless too high; but that some time elapsed after the brig filled away, before the collision, is clearly proved. From all this evidence I conclude that no injustice will be done the ship by the finding that the red light of the brig was visible to her for a period of at least five minutes before she struck the brig.

This conclusion is supported by other facts proved in the case, which may now be noticed. Of course, from the time the ship's light was reported by the lookout of the brig, the master and mate both on deck, as well as the crew, knew that the ship was approaching on the opposite tack, and yet the announcement of the light caused no alarm whatever on the brig. It is impossible to doubt, therefore, that those on board the brig, having the ship's light then in view, and called on to form a judgment as to the distance, concluded that there was then sufficient distance between the vessels to enable the ship to avoid them. This conclusion, shown by the conduct of every person on the brig's deck, and formed at the time by seamen who knew that their vessel was upon a course crossing that of the ship, goes a great way to prove the fact that the distance was sufficient.

Again, a comparison between the alarm displayed by those on board the ship when they saw the brig's light, and the absence of alarm on the brig when the ship's light was there reported, makes it plain that the distance between the vessels at the time the brig saw the ship's light, was to an important extent greater than the distance be-

tween the vessels when the ship's lookout first saw the brig's light. It would seem, therefore, that some negligence on the part of the ship's lookout must be conceded, and the fact is suggestive.

Not only was there no alarm felt on board the brig when the ship's light was seen, but it is proved that when the brig's lookout, observing that the ship did not alter her course, became alarmed, the chief mate went forward and then expressed the judgment that there was room for the ship to clear them as it was her duty to do. Furthermore it is proved that after the light had been announced the second time by the lookout of the brig, and the chief mate had returned aft, the master directed him to light the torch, and accordingly he left the deck and lit the torch, and returning to the deck, waved it towards the ship. It is difficult to believe that the master would have given that order unless the distance between the two vessels at that time was sufficient to enable the ship even then to avoid the brig.

This circumstance in regard to the torch, which is proved to have transpired on board the brig, not only after the vessel had gathered headway on the starboard tack, but after the ship's light had been twice announced, also shows that up to that time the brig's light had not been seen by the ship, because the ship was being closely watched from the brig, and it is not conceivable that the master would have directed the torch to be lighted, or that the mate would have waved it, if any change in the course of the ship had up to that time been seen. The change of course made by the ship—which was immediately upon seeing the brig's light—did not occur until the torch was waved on board the brig.

And finally it may be remarked that the argument made in behalf of the ship, based upon the presumption of a performance of his duty by the lookout of that vessel, has far greater force when applied to the master of the brig. On board the brig the duty of observing whether there was any vessel near and astern to make it dangerous to tack, attached not to the man stationed to look out ahead, but to the master, who had charge of the deck, and who alone was to determine when to tack. For the master to tack in that locality and wind, without first making careful observation whether any vessel was near enough aft him to render such a manoeuvre dangerous, would be great negligence; and in view of his responsibility for the property in his charge, the presumption against such neglect on the part of the master is much stronger than any presumption that a seaman stationed on the lookout performed that duty with vigilance. In the present case, the testimony of the master is wanting, for the master as well as the steward was lost when the brig went down. The chief mate, however, who was also on deck, swears that he looked before

the tack was made and the ship's light was not then in view: which is evidence to confirm the position of the libellants, that when the brig tacked the distance between the vessels exceeded a mile.

The circumstances which I have just noticed, coupled with the evidence before alluded to, force the conclusion that the brig's red light was displayed to the ship for a period of at least five minutes before the collision, during which time the ship sailed three thousand feet or over by her own showing, and in which time she could certainly have avoided the brig.

There would be no doubt, I take it, as to her negligence, if the ship, sailing six or seven knots an hour in a strong breeze, had run into the light-ship, having seen it at the distance of 3,000 or even 1,000 feet; but the brig was moving to the westward from the time she filled away, and by so much reducing the space necessary to enable the ship to clear her. I cannot doubt, therefore, that, upon the evidence as it stands in this case it is my duty to decide that negligence on the part of the ship in not seeing the brig in time to clear her caused the collision in question.

Having reached this conclusion from the testimony to which I have referred, it is unnecessary to consider the other fault claimed on the trial, but not set up in the answer, that the ship was also in fault for the manner in which her lights were set.